RECEIVED
JAN 4 2019
PETER A. MOORE, JR., CLERK
US DISTRICT COURT, EDNC

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
EASTERN DIVISION
No. 2:19-CV-2-BO

| | |
|---|---|
| ANTOINE D. MARTIN, Pro Se )<br><br>Plaintiff, )<br><br>v. )<br><br>ROY COOPER, Governor of the State of )<br>North Carolina; )<br><br>JOSHUA STEIN, Attorney General of the )<br>State of North Carolina; )<br><br>ERIK A. HOOKS, Secretary of the North )<br>Carolina Department of Public Safety; )<br><br>HERTFORD COUNTY SHERIFF'S )<br>OFFICE, )<br>Sheriff Dexter Hayes, Major Marty Davis; )<br><br>DISTRICT ATTORNEYS, )<br><br>Andrew Womble (District 01), Seth )<br>Edwards (District 02), Faris Dixon )<br>(District 03A) Scott Thomas (District 03B), )<br>Ernie Lee (District 04), Ben David )<br>(District 05), Valerie Asbell (District 06), )<br>Robert Evans (District 07), Matthew )<br>Delbridge (District 08), Mike Waters )<br>(District 09), Jacqueline Perez )<br>(District 09A), Nancy Lorrin Freeman )<br>(District 10), Vernon Stewart (District 11A), )<br>Susan Doyle (District 11B), Billy West )<br>(District12), Jon David (District 13), Satana )<br>Deberry (District 14), Sean Boone )<br>(District 15A), Jim Woodall (District 15B), )<br>Kristy Newton (District 16A), Matt Scott )<br>(District 16B), Reece Saunders (16C), )<br>Jason Ramey (District 17A) Ricky Bowman )<br>(District 17B), Avery Crump (District 18), )<br>Roxann Vaneekhoven (District 19A), Andy )<br>Gregson (District 19B), Brandy Cook )| **COMPLAINT FOR DECLARATORY<br>AND INJUNCTIVE RELIEF; NOTICE<br>OF CHALLEGE TO<br>CONSTITUTIONALITY OF STATE<br>STATUTE** |

1

(District 19C), Maureen Krueger )
(District 19D), Lynn Clodfelter, )
(District 20A), Trey Robison (District 20B), )
James O'Neill (District 21), Sarah Kirkman )
(District 22A), Garry Frank (District 22B), )
Tom Horner (District23), Seth Banks )
(District 24), Scott Reilly (District 25), )
Spencer Merriweather (District 26), )
Locke Bell (District 27A), Mike Miller )
(District 27B) Todd Williams (District 28), )
Ted Bell (District 29A), Greg Newman )
(District 29B), Ashley Welch (District 30); )
)
Defendants. )

## PLAINTIFF COMPLAINS AND ALLEGES AS FOLLOWS

### Applicable to all Causes of Action

#### Plaintiff

1. Plaintiff, ANTOINE D. MARTIN, shall at all times hereinafter be referred to as

"Plaintiff." Plaintiff is a resident of the State of North Carolina and is subject to the statutes of

Article 27A of Chapter 14 of the General Statutes of North Carolina due to a misdemeanor

conviction resulting from an Alford Plea on May 11, 2018 in the County of Cumberland in the

State of North Carolina.

2. Plaintiff was sentenced pursuant to the plea, to sixty (60) days with over 300 days

credit for time served. Plaintiff was released without probation, parole, or house arrest being

imposed as a condition of release. Plaintiff was specifically found to *not* be a high risk and does

*not* have a conviction for "offenses against a minor" as defined by §14-208.6(1m) of Article 27A

of Chapter 14 of the General Statutes of North Carolina.

3. Plaintiff's plea was a direct result of being subject to unreasonable searches and

seizures, warrants not based upon probable cause supported by oath or affirmation, the denial of

2

counsel in dealing with custodial interrogation, perjury on the part of the grand jury presenting indictment, ineffective assistance of trial counsel, excessive bail, and the denial of procedures of due process and equal protection of the laws as provided by the Constitution of the United States of America, the North Carolina State Constitution, and the General Statutes of North Carolina. Plaintiff maintains innocence of the charged and convicted offenses.

4. After filing motions for Ineffective Assistance of Counsel and Show-Cause, and presenting a legal argument based upon the General Statutes of North Carolina, the Constitution of the United States of America, and case law from federal courts, Plaintiff was told by the Senior Resident Superior Court Judge for the County of Cumberland, Hon. James Floyd Ammons, Jr., that his counsel would not be dismissed; if counsel was dismissed Plaintiff would have to provide his own counsel. This was told to Plaintiff although the very first thing he told the judge was that he was indigent pursuant to North Carolina General Statute 7A-450. Plaintiff notified the remainder of the Superior Court judiciary of the issues with counsel to no avail. Plaintiff was forced to be satisfied with the assigned counsel as the alternative was none at all.

5. Plaintiff registered with the Sheriff of the County of Hertford in the State of North Carolina on May 14, 2018. Plaintiff is currently registered in the County of Hertford.

6. Plaintiff is required to abide by Article 27A of Chapter 14 of the General Statutes of North Carolina due to the abovementioned conviction, and failure to do so may result in Plaintiff being charged with, and prosecuted for, a felony. Plaintiff was charged on August 16, 2018 with North Carolina General Statute Chapter 14, Article 27A, §14-208.11(a)(2) stating "as a person required by Article 27A of Chapter 14 of the General Statutes to register as a sex offender, fail to notify the Sheriff of Hertford County within 3 business days of a change of address, by moving

3

from 351 Boone Farm Road, Ahoskie, NC to an unknown address." This was the result of Plaintiff being at work.

**Defendants**

7. Defendant, ROY COOPER, is at present, the Governor for the State of North Carolina and is, *inter alia*, responsible for the taking care that laws be faithfully executed. (See Article III, §5(4) of the North Carolina State Constitution.) He is sued in his official capacity. Additionally, ROY COOPER was the Attorney General of the State of North Carolina in the hereinafter referenced cases of *State v. Abshire*, 363 N.C. 322, 677 S.E.2d. 444 (2009), *State v Worley,* 198 N.C. App. 329 (2009), and *State v McFarland,* 758 S.E.2d 457 (N.C. Ct. App. 2014). ROY COOPER shall at all times hereinafter mentioned be referred to as "Governor."

8. Defendant, JOSHUA STEIN, is the Attorney General for the State of North Carolina at present. He is sued in his official capacity. The Attorney General has the authority pursuant to Chapter 114, Article 3A, §114-11.6 of the General Statutes of North Carolina to prosecute or assist in the prosecution of criminal cases when requested to do so by a district attorney through special prosecutors.

9. The Attorney General is further authorized pursuant to Chapter 114, Article 1, §114-2(2) of the General Statutes of North Carolina to represent State departments and agencies. In accordance with Chapter 114, Article 1, §114-2(5) of the General Statutes of North Carolina, the Attorney General has a duty to give, when required, his opinion upon all questions of law submitted to him by the General Assembly, or by either branch thereof, or by the Governor or any other State officer.

10. The previous Attorney General, Governor, actively pursued prosecutions of unconstitutional restrictions on "sex offenders" (See *Packingham v. North Carolina*, 582

4

U.S.__(2017)) and JOSHUA STEIN actively pursues prosecutions challenged as unconstitutional pertaining to the same target group. (See *State v. Griffin No.* COA17-386 (2018)) JOSHUA STEIN shall at all times hereinafter mentioned be referred to as "Attorney"

 11. Defendant, ERIK A. HOOKS, is the Secretary for the Department of Public Safety. He is sued in his official capacity. Pursuant to Chapter 14, Article 27A, §14-208.14 of the General Statutes of North Carolina, the Department of Public Safety is responsible for compiling and keeping current the central statewide sex offender registry. Under Chapter 14, Article 27A, §14-208.15 of the General Statutes of North Carolina, the Department of Public Safety is responsible for the dissemination of information about registrants to the public via the internet.

 12. The Department of Public Safety releases this information through a law enforcement agency, the North Carolina State Bureau of Investigations, of which the Department of Public Safety is an umbrella agency.

 13. The North Carolina State Bureau of Investigation additionally compiles crime data. Pursuant to Chapter 164, Article 4, §164-47 of the General Statutes of North Carolina, the Department of Public Safety conducts research on recidivism which includes, or has included, information on sex offender recidivism and risk level. Moreover, the Section of Community Corrections of the Division of Adult Corrections and Juvenile Justice of the Department of Public Safety conducts individualized assessments of persons convicted, or about to be convicted, of offenses requiring registration via the Static-99 assessment. ERIK A. HOOKS shall at all times hereinafter mentioned be referred to as "Secretary."

 14. Defendant, HERTFORD COUNTY SHERIFF'S OFFICE, is a law enforcement agency having jurisdiction over the County of Hertford in the State of North Carolina and shall at all times hereinafter mentioned be referred to as "Sheriff's Department."

5

15. Sheriff Dexter Hayes is the Sheriff of the County of Hertford and shall at all times hereinafter mentioned be referred to as "Sheriff." He is sued in his official capacity. Major Marty Davis is the law enforcement officer who is in charge of the Sex Offender Registry within the County of Hertford. Defendant, Major Marty Davis shall hereinafter be referred to as "Major." He is sued in his official capacity.

16. Plaintiff was charged on August 16, 2018 by "M M Davis Hertford County Sheriffs Office" with "as a person required by Article 27A of Chapter 14 of the General Statutes to register as a sex offender, fail to notify the Sheriff of Hertford County within 3 business days of a change of address, by moving from 351 Boone Farm Road, Ahoskie, NC to an unknown address."

17. Defendant, DISTRICT ATTORNEYS, consists of the individual district attorneys of the State of North Carolina. Pursuant to §7A-61 of Article 9 of Chapter 7A of the General Statutes of North Carolina, the individual district attorneys are responsible for prosecuting "in a timely manner in the name of the State all criminal actions and infractions requiring prosecution in the superior and district courts of the district attorney's prosecutorial district and advise the officers of justice in the district attorney's district." All individual district attorneys are sued in their official capacity.

18. Individuals, who, as officers of the State, are clothed with some duty in regard to the enforcement of the laws of the State, and who threaten and are about to commence an action, either civil or criminal, to enforce an unconstitutional state statute, may be enjoined from so doing by a Federal court. (See *Ex Parte Young,* 209 U.S. 123 (1908) *Id.* at 155-156*)*

19. Defendants, named above, acting in their official capacity proscribed by law, are tasked with enforcement of Article 27A of Chapter 14 of the General Statutes of North Carolina.

6

Under the color of law, Defendants enforce unconstitutional statutes, remain deliberately indifferent to the injuries caused by enforcement of the statutes of Article 27A, remain deliberately indifferent to the false allegation made in the purpose of Article 27A, cause Plaintiff to be subjected to the deprivation of rights secured by the Constitution of the United States of America, and to suffer other injuries.

20. As a result of the actions of Defendants in their official capacity, Plaintiff has and will continue to suffer injuries as outlined in the hereinafter mentioned Causes of Action from the enforcement of Article 27A of Chapter 14 of the General Statutes of North Carolina. The requested relief will redress the suffered injuries.

## Jurisdiction and Venue

21. Plaintiff's claims are brought pursuant to 42 U.S.C § 1983

22. Jurisdiction of federal claims is proper under 28 U.S.C §§ 1331 and 1343. Plaintiff seeks redress for the deprivation of rights secured by the Constitution of the United States of America.

23. Supplemental jurisdiction over state law claims is proper under 28 U.S.C § 1367

24. Venue is proper in the Eastern District of North Carolina pursuant to 28 U.S.C § 1391. Plaintiff currently resides in the federal Eastern District of North Carolina. Defendants are all residents of the State of North Carolina, and at least one defendant is a resident in the federal Eastern District of North Carolina. A substantial part of the events giving rise to the claim occurred in the federal Eastern District of North Carolina.

25. The declaratory and injunctive relief sought by Plaintiff are authorized by 28 U.S.C §§ 2201 and 2202, Federal Rules of Civil Procedure 57 and 65, and the legal and equitable powers of the Court.

## Factual Allegations

### Historical Development of the Article 27A

26. The North Carolina Sex Offender and Public Protection Registration Program, located under Article 27A of Chapter 14 of the General Statutes of North Carolina, was originally enacted in 1996 by the State of North Carolina ("General Assembly") under the title of "Sexual Offender Registration Programs."

27. The State of North Carolina based the justification for Article 27A of Chapter 14 of the General Statutes of North Carolina on the premise that "the General Assembly recognizes that sex offenders often pose a high risk of engaging in sex offenses even after being released from incarceration or commitment and that protection of the public from sex offenders is of paramount governmental interest," "Release of information about sex offenders will further the governmental interests of public safety so long as the information released is rationally related to the furtherance of those goals," and "it is the purpose of this Article to assist local law enforcement agencies' efforts to protect their communities by requiring sex offenders to register with local law enforcement agencies and to require the exchange of relevant information about sex offenders among law enforcement agencies and to authorize the access to necessary and relevant information about sex offenders to others as provided in this Article." (See *N.C. Gen. Stat §14-208.5 (1995)*)

28. At the time of its enactment, Article 27A of Chapter 14 of the General Statutes of North Carolina mandated persons required to register ("registrants"), pursuant to Article 27A of Chapter 14 of the General Statutes of North Carolina, to register in-person once for their initial registration. Registrants were additionally required to make notifications of changes of address

8

and could do so by mail. (See *N.C. Gen. Stat §§14-208.7(1995, c. 545, s.1) and 14-208.9 (1995, c. 545, s.1))*

29. Failure to register was punishable as "a Class 3 misdemeanor for a first conviction of this Article, and a Class I felony for a subsequent conviction of this Article." (See *N.C. Gen. Stat §14-208.11(1995, c. 545, s.1)*)

30. In its initial enactment "a person who has a reportable conviction may petition the superior court in the county where the person resides for an exemption from this Article. The person shall serve a copy of the petition on the district attorney. If the person shows for good cause, by clear and convincing evidence, that registration will not serve any useful purpose, the court shall grant the exemption." (See *N.C Gen. Stat §14-208.12 (1995, c. 545, s.1)*) A person could petition to come off at any time

31. In 1997, the law was amended to "establish a 10-year registration requirement for persons convicted of certain offenses against minors or sexually violent offenses." A person lost their ability to appeal the decision of dangerousness at any time but was now automatically terminated from registration requirements after 10 years. (See *N.C. Gen. Stat §14-208.6A (1997 - 516, s. 1.)*)

32. The penalty for failure to register, falsification of verification notice, and failure to return verification form was raised to a Class F felony as well at this time. (See *N.C. Gen. Stat §14-208.11 (a) (1997 -516, s. 1.)*)

33. In 2001, the General Assembly again amended Article 27A of Chapter 14 of the General Statutes of North Carolina now defining Recidivist as "'Recidivist' means a person who has a prior conviction for an offense that is described in G.S. 14-208.6(4)." (See *N.C. Gen. Stat §14-208.6 (2b) (2001-373, s. 1)*)

9

34. Notification of moving to another state became required at this time as well. (See *N.C. Gen. Stat §14-208.9(b) (2001-373, s. 1)*)

35. In 2002, the General Assembly again amended Article 27A of Chapter 14 of the General Statutes of North Carolina to require "a statement indicating whether the person is a student or expects to enroll as a student within a year of registering" which required the disclosure of the "name and address of the educational institution at which the person is a student or expects to enroll as a student;" and "a statement indicating whether the person is employed or expects to be employed at an institution of higher education within a year of registering" which required "the name and address of the education institution at which the person is or expects to be employed." (See *N.C Gen. Stat §§ 14-208.7(b)(5) and 14-208.7(b)(6) (2002-147, s. 20)*)

36. At this time, the General Assembly also required changes in academic status by enrolling or terminating enrollment as a student, and changes in employment by obtaining employment or terminating employment at an institution of higher education to be notified. (See *N.C. Gen. Stat §§ 14-208.9(c) and 14-208.9(d) (2002-147, s. 20)*)

37. In 2003, the General Assembly required persons convicted of North Carolina General Statutes Chapter 14, Article 26, § 14-202(d), (e), (f), (g), or (h) to be subject to an individual judicial determination of "whether the person is a danger to the community and whether requiring the person to register as a sex offender pursuant to Article 27A of this Chapter would further the purposes of that Article as stated in G.S. 14-208.5" (See *N.C. Gen. Stat § 14-202(l) (2003-303, s. 2)*)

38. In 2005, Sexual Battery (N.C. Gen. Stat. 14-27.5A at the time) was included into the definition of "sexually violent offense" making it the only misdemeanor classified as such and carrying mandatory registration pursuant to Article 27A of Chapter 14 of the General Statutes of

10

North Carolina without any individualized assessment. (See *N.C. Gen. Stat §14-208.6(5) (2005-130)*)

39. In 2006, statutory rape or sexual offense of a person who is 13-, 14-, or 15-years-old where the defendant is at least six years older (G.S. 14-27.7A(a) at the time)) was added to the definition of "sexually violent offense" (See *N.C. Gen. Stat §14-208.6(5) (2006-247, ss. 1(b), 19(a), 20(d)*)

40. Also at this time, "in person" registration became a requirement for "any person convicted of an offense against a minor or of a sexually violent offense as defined by this Article." (See *§14-208.6A (2006-247, ss. 1(b), 19(a), 20(d)*)

41. Under §14-208.9 (2006-247, ss. 1(b), 19(a), 20(d)) in person notification became required for a change of address, academic status, and educational employment status.

42. Semiannual in-person verification of registry information became mandated. (See *N.C. Gen. Stat §14-208.8A(1) (2006-247, ss. 1(b), 19(a), 20(d)*)

43. Law enforcement became authorized to attempt to verify that a registrant continued to live at the address last registered at any time. Law enforcement additionally became authorized to require the allowing of additional photographs, as well as the requirement for a registrant to appear in person within 72 hours of being requested for the purpose of allowing another photograph to be taken. Failure to comply with this was a Class 1 misdemeanor. (See *N.C. Gen. Stat. §14-208.9A(b) and §14-208.9A(c) (2006-247, ss. 1(b), 19(a), 20(d)*)

44. Additionally, the General Assembly enacted the "notification requirement for out-of-county employment if temporary residence established." (See *N.C. Gen. Stat §14-208.8A (2006-247, ss. 1(b), 19(a), 20(d)*)

45. Pursuant to §14-208.11A (2006-247, ss. 1(b), 19(a), 20(d)) a "duty to report noncompliance of a sex offender" and "penalty for failure to report in certain circumstances" were introduced, carrying a penalty of a Class H felony. None of the requirements of the Article actually referenced in the statute pertain to a sex offense or any illegal or dangerous activity with a minor. These requirements made conduct by the general public, who may have had no prior criminal record, subject to criminal sanctions.

46. Furthermore at this time, residential (N.C. Gen. Stat §14-208.16), work, volunteer, and residential use restrictions came into effect. (N.C. Gen. Stat §14-208.17) (2006-247, ss. 1(b), 19(a), 20(d)). Also under the latter statute, the General Assembly considered all persons required to register under Article 27A of Chapter 14 of the General Statutes of North Carolina as a "sexual predator." This requires no finding of predation taking place.

47. Definitions of predator from dictionaries include "A person who ruthlessly exploits others" and "one who injures or exploits others for personal gain or profit." (See https://www.google.com/search?ei=cqHoW4HjPLLt5gLptIm4CA&q=predator+definition&oq=pr edator+definition&gs_l=psy-ab.3..0l10.2009.4180..4434...0.0..0.796.796.6-1......0....1..gws-wiz.......0i71.uc9J60RnD7w (Last visited November 11, 2018) https://www.merriam-webster.com/dictionary/predator (Last visited November 11, 2018))

48. The State of North Carolina also introduced "Sex Offender Monitoring" via a continuous satellite-based monitoring system. (See N.C. Gen. Stat §§ 14-208.33 and 14-208.34 (2006-247, ss. 1(b), 19(a), 20(d))

49. In 2008, the law changed to establish a 30-year registration requirement with an opportunity to petition only after 10 years. (See N.C. Gen. Stat §14-208.6A (2008-117, s. 6.1))

12

50. The time period for registration and notification dropped from 10 days to "three business days" in most instances. (See *N.C. Gen. Stat §§ 14-208.7, 14-208.9, 14-208.9A (2008-117, s. 6.1)*)

51. During this period, "sex offender unlawfully on premises" was enacted making it unlawful for a person required to register to be on the premises of any place intended primarily for the use, care, or supervision of minors; within 300 feet of any location intended primarily for the use, care, or supervision of minors when the place is located on premises that are not intended primarily for the use, care, or supervision of minors; and at any place where minors gather for regularly scheduled educational, recreational, or social programs. (See *§14-208.18 (2008-117, s. 6.1)*)

52. Also occurring in 2008, the General Assembly passed § 14-202.5 (2008-218, s. 6) which banned use of commercial social networking Web sites by sex offenders. This statute was placed in Article 26 of Chapter 14 but still applied to persons required to register pursuant to Article 27A of Chapter 14 of the General Statutes of North Carolina.

53. Continuing in 2008, the legislature introduced the requirement for disclosure of "any online identifier that the person uses or intends to use." (See *N.C. Gen. Stat §14-208.7(b)(7) (2008-220, s. 1)*) Further, the legislature required the notification of a "change of online identifier." (See *N.C. Gen. Stat §14-208.9(e) (2008-220, s. 1)*)

54. In 2012, "permitted unlawful sale, surrender, or purchase of a minor" was included to be an offense for which upon conviction "the sentencing court shall consider whether the person is a danger to the community and whether requiring the person to register as a sex offender pursuant to Article 27A of this Chapter would further the purposes of that Article as stated in G.S. 14-208.5" (See *N.C. Gen. Stat §14-43.14 (2012-153, s. 3)*)

13

55. Human Trafficking (§14-43.11) was added to the definition of "sexually violent offense" in 2013 making it an offense requiring registration. (See *N.C. Gen. Stat §14-208.6(5) (2013-33, s. 1)*)

56. In 2014, the Department of Public Safety was assigned to maintain registration information as prescribed by §14-208.14 of Article 27A of Chapter 14 of the General Statutes of North Carolina.

57. Originally created with the requirement that a person appear in person once to initially register and then verify their information annually (which could be done by mail) after that; over the span of the 22 years since, Article 27A of Chapter 14 of the General Statutes of North Carolina has repeatedly been amended, each time making the laws' restrictions more "stringent" and repeatedly adding new offenses for registration and penalties, some of which can be applied to non-registrants, harsher. This has been done without any evidence that the targeted group poses the risk alleged or that the measures implemented achieve the stated aim.

58. Today, persons required to register pursuant to Article 27A of Chapter 14 of the General Statutes of North Carolina must do so for 30 years with the possibility of being able to petition to be removed only being available after 10 years and only upon successful petition for removal as opposed to guaranteed termination after 10 years or petitioning at any time, must appear in person, at minimum, two (2) times a year which can extend to the frequency of daily (See *State v McFarland,* 758 S.E.2d 457 (N.C. Ct. App. 2014). "As explained in Worley, everyone, at all times, has some address for purposes of the sex offender registration statutes, even if it changes daily. Worley, 198 N.C.App. at 338, 679 S.E.2d at 864."), must appear in person pursuant to thirteen (13) different laws, and must do so within three (3) business days in most cases.

14

59. Failure to make the required notifications within the statutorily prescribed time frame is at present a Class F felony. (See *N.C. Gen. Stat §14-208.11*)

60. The current form of Article 27A of Chapter 14 of the General Statutes of North Carolina makes it a Class H felony for people to not report a registered sex offender's noncompliance, placing conduct requirements on persons not convicted of any offense. (See *N.C. Gen. Stat §14-208.11A*)

61. Additionally, the requirements have evolved even further with affirmative restraints and disabilities which place residential restrictions of 1,000 feet, prohibits certain forms of employment and volunteering, and makes unlawful just being at a location at all. (See *N.C. Gen. Stat §§ 14-208.16, 14-208.17, and 14-208.18*.).

### Statistical Facts

62. All of the requirements, affirmative steps, affirmative restraints and disabilities, and penalties of Article 27A of Chapter 14 of the General Statutes of North Carolina, are under the guise that "the General Assembly recognizes that sex offenders often pose a high risk of engaging in sex offenses," therefore it is the purpose of Article 27A of Chapter 14 of the General Statutes of North Carolina to "assist law enforcement agencies'" by requiring registration, "exchange of relevant information," and authorizing "access to necessary and relevant information." Release of information is the only thing that the General Assembly says will further the governmental interests of public safety. See *N.C. Gen. Stat. §14-208.5*

63. While Plaintiff cannot be sure of the exact reasoning on the part of the General Assembly for the belief that "sex offenders often pose a high risk of engaging in sex offenses even after being released from incarceration or commitment and that protection of the public from sex offenders is of paramount governmental interest" (See *N.C. Gen. Stat. §14-208.5*), this

15

belief does seem consistent with a U.S. Department of Justice publication in 1988 "A

Practitioner's Guide to Treating the Incarcerated Male Sex Offender xiii (1988)" claiming that:

> Although there are a number of problems in using recidivism rates to measure program success in any area, the rate of recidivism of treated sex offenders is fairly consistently estimated to be around 15%. According to Robert Freeman-Longo, Clinical Director of the Oregon State Hospital Sex Offender Treatment Program, the recidivism rate of untreated offenders is around 80%. Even if both of these figures are exaggerated, there would still be a significant difference between treated and untreated individuals.
>
> However, Freeman-Longo (1986) states that 80% of untreated incarcerated sex offenders recidivate, while the figure is reversed for treated offenders.

64. Citation for the above quotes was given as "Freeman-Longo, R. (1986, March).

*Changing a Lifetime of Sexual Crime. Psychology Today*, 58-64" and is the sole reference for an

80% statistic. This article was not from a peer reviewed scientific journal, contained no data to

support its assertion, and no citations. Even the author of the article states that this is incorrect

and not reflective of all "sex offenders." In the article, the referenced quote states "Most

untreated sex offenders released from prison go on to commit more offenses—indeed, as many

as 80 percent do."

65. In *McKune v. Lile*, 536 U.S. 24 (2002), United States Supreme Court Justice Kennedy

stated:

> Therapists and correctional officers widely agree that clinical rehabilitative programs can enable sex offenders to manage their impulses and in this way reduce recidivism. See U. S. Dept. of Justice, Nat. Institute of Corrections, A Practitioner's Guide to Treating the Incarcerated Male Sex Offender xiii (1988) ("[T]he rate of recidivism of treated sex offenders is fairly consistently estimated to be around 15%," whereas the rate of recidivism of untreated offenders has been estimated to be as high as 80%. "Even if both of these figures are exaggerated, there would still be a significant difference between treated and untreated individuals") *Id*. at 33

66. This information was provided in an amicus brief submitted by Solicitor General

Theodore B. Olson. No other source is cited to support the 80% statistic in the brief.

16

67. Also within this brief, the Solicitor General stated "when they reenter society at large, convicted sexual offenders are much more likely to repeat the offense of conviction than any other type of felon. Sex Offenses and Offenders 27; U.S. Dep't of Justice, Bureau of Justice Statistics, Recidivism of Prisoners Released in 1983, p. 6 (1997)"

68. This translated in the decision as "When convicted sex offenders reenter society, they are much more likely than any other type of offender to be rearrested for a new rape or sexual assault. See id., at 27; U. S. Dept. of Justice, Bureau of Justice Statistics, Recidivism of Prisoners Released in 1983, p. 6 (1997)"- *Id.* at 33

69. Of note in this study, and not articulated by the Solicitor General, is the fact that of 108,580 people looked at in the study, 2.1% (2,280) were identified as having committed a rape and 2.1% (2,280) as having committed an "other sexual assault." Of that number, 7.7% (176) of persons with a rape conviction were arrested for another rape. For "other sexual acts" the percentage was 5.5% (125) which combined with the rapes gives a total number of 301 out of 4,560 in regard to all new sexually related arrests of that group. This number means that 6.6% of released "sex offenders" were alleged to have committed another sexually related offense after their release, showing that 93.4% (4,259) did not sexually recidivate per the numbers provided in the study. This was before any federal, and most state, sex offender laws went into effect.

70. Justice Kennedy, based on the statements made by the Solicitor General continues on to say that "the first critical step in the Kansas SATP, therefore is acceptance of responsibility for past offenses. This gives inmates a basis to understand why they are being punished and to identify the traits that cause such a frightening and high risk or recidivism." *Id.* at 33-34

17

71. Continuing on, "Kansas asks sex offenders to participate in SATP because, in light of the high rate of recidivism, it wants all, not just the few who volunteer, to receive treatment." *Id.* at 44

72. The topic of sex offender recidivism appeared again in *Smith v. Doe*, 538 U.S. 84 (2003) in which the Alaska Sex Offender Registration Act was challenged as a violation of the *Ex Post Facto* Clause of Article 1, §10, Clause 1 of the Constitution of the United States of America.

73. In denying the claim on the grounds of holding that the Alaska Sex Offender Registration Act was nonpunitive, (The act required one in-person registration and dissemination of registrant information online. No affirmative disabilities or restraints were placed upon him either and no in-person appearances were required after initial registration) it was stated:

> Alaska could conclude that a conviction for a sex offense provides evidence of substantial risk of recidivism. The legislature's findings are consistent with grave concerns over the high rate of recidivism among convicted sex offenders and their dangerousness as a class. The risk of recidivism posed by sex offenders is "frightening and high." *McKune v. Lile*, 536 U. S. 24, 34 (2002); see also *id.*, at 33 ("When convicted sex offenders reenter society, they are much more likely than any other type of offender to be rearrested for a new rape or sexual assault" (citing U. S. Dept. of Justice, Bureau of Justice Statistics, Sex Offenses and Offenders 27 (1997); U. S. Dept. of Justice, Bureau of Justice Statistics, Recidivism of Prisoners Released in 1983, p. 6 (1997))) id at 103

74. The State of North Carolina in *Packingham v. North Carolina*, 582 U.S. __ (2017) attempted to use the same argument of alleged high recidivism of registrants to defend Chapter 14, Article 26, §14-202.5(a), (e) which put a ban on the use of commercial networking Web sites on persons required to register pursuant to Article 27A of Chapter 14 of the General Statutes of North Carolina.

75. In the oral arguments, the attorney representing the State of North Carolina, Robert C. Montgomery, stated "and this Court has recognized that they have a high rate of recidivism and

18

are very likely to do this again. Even as late as 20 years from when they are released, they may recidivate" making reference to claims made in *Smith v. Doe*, 538 U.S. 84 (2003) and *McKune v Lile*, 536 U.S. 24 (2002).

76. In the 30 years since the U.S. Department of Justice's Bureau of Justice Statistics' publication in 1988, a vast amount of research has gone into studying recidivism of persons labelled as "sex offenders." Empirical data over and over shows that overall and sex related recidivism of persons convicted of a prior sex offense is nowhere near the alleged 80%, and recidivism is actually below that of most other criminal offense categories.

77. Additionally, this research has consistently shown that "sex offenders" do not often commit another sexual offense, but that the majority of rearrests are for non-sexually related offenses. The 1983 study referenced in *McKune v. Lile*, 536 U.S. 24 (2002), showed that close to 87% of people with a prior sexually related offense who were rearrested, were not rearrested for a sexually related offense. Repeated studies have shown consistently that over 90% do not recidivate with a sex related offense.

78. The U.S. Department of Justice Bureau of Justice Statistics published one of the most comprehensive assessments on convicted "sex offender" behavior after their release in 2003. This study, which included 9,691 persons convicted of a prior sex related offense released from 15 different state prisons (including North Carolina) in 1994, found that 5.3% of persons with a prior sex offense conviction were arrested for another sex offense. 43% were rearrested for various offenses. Overall, sex offenders were considered "less likely than non-sex offenders to be rearrested for any offense."- *Langan, Patrick A., Schmitt, Erica L., and Durose, Matthew R., Statisticians, Bureau of Justice Statistics, Recidivism of Sex Offenders Released from Prison in*

*1994 (November 2003, NCJ 198281);* https://www.bjs.gov/content/pub/pdf/rsorp94.pdf (Last visited December 1, 2018)

79. This study further found that only 3.5% of sex offenders were actually convicted for a new sex crime, and 24% were convicted for any new offense. People labelled as "sex offenders" are generally more likely to be arrested for a non-sex related offense. *Langan, Patrick A., Schmitt, Erica L., and Durose, Matthew R., Statisticians, U.S Dept. of Justice, Bureau of Justice Statistics, Recidivism of Sex Offenders Released from Prison in 1994 (November 2003, NCJ 198281);* https://www.bjs.gov/content/pub/pdf/rsorp94.pdf (Last visited December 1, 2018)

80. In the State of North Carolina, a report is released every two years by the North Carolina Sentencing and Policy Commission. This report provides information on recidivism in the State of North Carolina of those placed on probation or released from prison. (Links to all referenced reports may be found at https://www.nccourts.gov/documents/publications/adult-recidivismcorrectional-program-evaluation (Last visited December 6, 2018))

81. The report released in April of 2008 evaluating 1,102 persons released in fiscal year 2003/04 that were required to register pursuant to Article 27A of Chapter 14 of the General Statutes of North Carolina found  "Almost 57% were low risk, 41.1% were medium risk, and 2.2% were high risk. Overall, 25.3% of the offenders required to register as a sex offender had a recidivist arrest during the three-year follow-up period. When compared to each offense class grouping, offenders required to register as sex offenders had higher percentages of low risk offenders and lower percentages of high risk offenders. They also had lower rearrest rates." See *North Carolina Sentencing and Policy Advisory Commission Correction Program Evaluation: Offenders Placed on Probation or Released From Prison in Fiscal Year 2003/04 p. 31* (2008)

20

82. The report released in April of 2010 evaluating 1,309 persons released in fiscal year 2005/06 that were required to register pursuant to Article 27A of Chapter 14 of the General Statutes of North Carolina found "almost 58% were low risk, 38.4% were medium risk, and 3.7% were high risk. Overall, 25.3% of the offenders required to register as a sex offender had a recidivist arrest during the three-year follow-up period. When compared to each offense class grouping, offenders required to register as sex offenders had higher percentages determined to be low risk and lower percentages deemed high risk. They also had lower overall rearrest rates."- *North Carolina Sentencing and Policy Advisory Commission Correction Program Evaluation: Offenders Placed on Probation or Released From Prison in Fiscal Year 2005/06 p. 34* (2010)

83. The report released in April of 2012 evaluating 1,048 persons released in fiscal year 2008/09 that were required to register pursuant to Article 27A of Chapter 14 of the General Statutes of North Carolina and conducted in conjunction with the Division of Adult Correction and Juvenile Justice of the North Carolina Department of Public Safety found "Fifteen percent were minimum risk [30.2% low, 31.6% moderate] and 22.0% were high risk. Overall, 26.6% of the offenders required to register as a sex offender had a recidivist arrest during the two-year follow-up period. When compared to each offense class grouping, offenders required to register as sex offenders were more similar to misdemeanants than to felons. They also had lower overall rearrest rates."- *North Carolina Sentencing and Policy Advisory Commission Correction Program Evaluation: Offenders Placed on Probation or Released From Prison in Fiscal Year 2008/09 p. 32, 33* (2012)

84. The report released in April of 2014 evaluating 962 persons released in fiscal year 2010/11 that were required to register pursuant to Article 27A of Chapter 14 of the General Statutes of North Carolina and conducted in conjunction with the Division of Adult Correction

21

and Juvenile Justice of the North Carolina Department of Public Safety found "Overall, 27.0% of the offenders required to register as a sex offender had a recidivist arrest during the two-year follow-up period. Fourteen percent of the offenders required to register as a sex offender had a recidivist conviction and 26.3% had a recidivist incarceration. *North Carolina Sentencing and Policy Advisory Commission Correction Program Evaluation: Offenders Placed on Probation or Released From Prison in Fiscal Year 2010/11 p. 30, 31* (2014)

85. The report released in April of 2016 evaluating 988 persons released in fiscal year 2012/13 that were required to register pursuant to Article 27A of Chapter 14 of the General Statutes of North Carolina and conducted in conjunction with the Division of Adult Correction and Juvenile Justice of the North Carolina Department of Public Safety found "overall, 26% of the offenders required to register as a sex offender had a recidivist arrest, 14% had a recidivist conviction, and 21% had a recidivist incarceration. Sex offenders generally had lower recidivism rates than most groups"- *North Carolina Sentencing and Policy Advisory Commission Correction Program Evaluation: Offenders Placed on Probation or Released from Prison in Fiscal Year 2012/13 p. 18, 19* (2016)

86. The report released in April of 2018 evaluating 927 persons released in fiscal year 2014/15 that were required to register pursuant to Article 27A of Chapter 14 of the General Statutes of North Carolina and conducted in conjunction with the Division of Adult Correction and Juvenile Justice of the North Carolina Department of Public Safety found "Overall, 24% of the offenders required to register as a sex offender had a recidivist arrest, 11% had a recidivist conviction, and 27% had a recidivist incarceration. Sex offenders generally had lower recidivism rates than most groups"-*North Carolina Sentencing and Policy Advisory Commission Correction*

*Program Evaluation: Offenders Placed on Probation or Released from Prison in Fiscal Year 2014/15 p. 21, 22* (2018)

87. The numbers included in the arrest, conviction, incarceration percentages were for any arrest, including technical violations of the registration requirements.

88. The Department of Public Safety has now, itself, produced at least 10 years' worth of data on recidivism pertaining to persons required to register as "sex offenders" pursuant to Article 27A of Chapter 14 of the General Statutes of North Carolina, which shows virtually no downward trend in recidivism arrest. This data shows consistently that persons required to register pursuant to Article 27A of Chapter 14 of the General Statutes of North Carolina were considered low risk the majority of the time and had recidivism for arrest and conviction lower than other offense categories. This has remained at a relatively consistent level throughout the enactment of increasingly more and more stringent requirements as seen above.

89. Rates of sex related offenses have consistently followed the pattern of the crime index and violent crime. When the rate of one rose, the rate of sex related offenses rose typically and vice versa. The change in rates does not appear to coincide with any registration requirements being enacted.

90. From 1978 until 1992 there was an almost steady increase in the number and rate of rapes in the State of North Carolina. In 1993 that trend reversed and the number and rate continued decreasing until 1996, the very same year that Article 27A of Chapter 14 of the General Statutes of North Carolina went into effect. From 1997 until 2000 the rates declined although in 2000 there were more incidents of rape. From 2001 until 2010 there was a constant fluctuation between the rates and number of incidents increasing and decreasing each year forming no discernable pattern.

23

91. During the period of 2001-2010, a series of measures were enacted placing more stringent requirements on persons required to register pursuant to Article 27A of Chapter 14 of the General Statutes of North Carolina; none of which appear to have had any discernable effect on the overall number of sex offenses that occurred during that period. Reports on recidivism arrest and convictions during that time period show no statistically significant change.

92. From 2010 through 2016 there is no significant pattern associated with legislation. From 1996 (the year that Article 27A of Chapter 14 of the General Statutes of North Carolina went into effect) until 2016 (the last data available to Plaintiff at this time); the number of rapes has gone from 2,264 to 2,067 with a drop in the rate from 32 to 21.1. During this same time period the rate per 100,000 for all crime has dropped.

93. The Index Crime rate has dropped from 5591.3 to 3,154.5, violent crime from 618.9 to 374.9, robbery from 176.2 to 95.9, aggravated assault from 402 to 251, property crime from 4972.4 to 2779.7, burglary from 1472.2 to 721.6, and arson from 26.4 to 14.9. No data suggest that the restrictions placed on persons required to register pursuant to Article 27A of Chapter 14 of the General Statutes of North Carolina were warranted or have had any effect on recidivism nor the number and rate of offenses.

94. North Carolina is not alone in low recidivism rates for persons labelled "sex offender."

95. "Sex offenders had statistically significant lower rates of return to prison for a new crime than other offenders at one, two, and three years after release from prison. Within one year, 4.0% of sex offenders returned to prison (for any new crime) compared to 7.1% of other offenders. Sex offender return rates after two and three years were 8.8% and 15.0%, which were lower than the return rate of all other offenders at 15.1% and 21.0%, respectively. However, sex

24

offender return rates for sex offenses at one, two, and three years were 0.7%, 1.8%, and 3.8%"-
See *USM Muskie School of Public Service (2010) Sexual Assault Trends and Sex Offender
Recidivism in Maine*

96. "Specifically, the pre-LB 285 classification system resulted in a 2-year recidivism
rate of 1.7% and a 1-year recidivism rate of 0.6%. In comparison, the post-LB 285 classification
system resulted in a 2-year recidivism rate of 2.6% and a 1-year recidivism rate of 1.7%."- See
*Consortium for Crime and Justice Research University of Nebraska-Omaha, Spohn, Ryan PhD.,
Nebraska Sex Offender Registry Study (2013);*
*http://news.legislature.ne.gov/dist20/files/2013/08/NE_sex_offender_recidivism.pdf* (Last
visited December 7, 2018)

97. "For example, while nearly a quarter (24.6%) of sex offenders in the sample had been
rearrested for any offense within the first year of their release from incarceration, only 1.7
percent had been arrested for a new sex offense. At the 3-year mark, 40.4% of the sample had
been rearrested for any offense, but only 4.2 percent had been arrested for a new sex offense.
And, by seven years post-release, more than half (55.7%) of the sample had been arrested for any
offense, only 7.1 percent had been arrested for a new sex offense. (Note: Reconvictions for sex
offenses are not displayed in Figure 10.6 due to extremely small values.)"- See *Myrstol, Brad A.
Ph.D., Rivera, Marny Ph.D., Parker, Khristy M.P.A. "Alaska Sex Offender and Processing
Study'* *https://scholarworks.alaska.edu/bitstream/handle/11122/7342/1408.02.aksorcps-
final.pdf* (Last visited December 6, 2018)

98. "In 2005, 746 offenders who had served a prison sentence for at least one sex-related
offense were released or discharged from prison. Over the next five years: 27 (3.6%) of these
men were arrested and charged with a new sex crime, 20 (2.7%) were convicted for new sex

offense, and 13 (1.7%) were returned to prison to serve a sentence for a new sex crime." "The sexual recidivism rates for the 746 sex offenders released in 2005 are much lower than what many in the public have been led to expect or believe. These low re-offense rates appear to contradict a conventional wisdom that sex offenders have very high sexual re-offense rates."- See *State of Connecticut Office of Policy and Management Criminal Justice Policy & Planning Division (2012) Recidivism among sex offenders in Connecticut p. 4.*

*https://www.ct.gov/opm/lib/opm/cjppd/cjresearch/recidivismstudy/sex_offender_recidivism_2012_final.pdf* (Last visited December 1, 2018)

99. "Based on official arrest records, seven of the 290 released sex offenders (2.4%) were rearrested for a new sex crime within the first three years following their release (table 17). Of the total 290 released sex offenders, two (0.7%) were reconvicted for a sex crime within three years" *Arizona Criminal Justice Commission Recidivism of Sex Offenders Released from the Arizona Department of Corrections in 2001 (2009) p. 16*

*https://cvpcs.asu.edu/sites/default/files/content/projects/Rodriquez%20stevenson.pdf* (Last visited December 1, 2018)

100. In Ohio, ten (10) year recidivism found a 34% recidivism with 8% for a new sex offense, 14.3% non-sex offense, 1.3% sex offense technical violation, 1.7% sex lapse technical violation, and 8.7% non-sex related technical violation. Sex offenders who returned for a new sex related offense did so within a few years of release. Of all the sex offenders who came back to an Ohio prison for a new sex offense, one half did so within two years, and two-thirds within three years-See *State of Ohio Department of Rehabilitation and Correction (2001) Ten-Year Recidivism Follow-Up of 1989 Sex Offender Releases*

*https://www.publicsafety.ohio.gov/links/ocjs_SexOffenderReport.pdf* (Last visited December 1, 2018)

101. "The overall recidivism rates for the entire sample of 759 participants at fixed 3-year follow-up periods from the dates of placement in the community were as follows: sexual, 4.6% (35); any violent, 8.6% (65); and any criminal recidivism, 23.1% (175)" See *McGrath, Robert J., Lasher, Michael P., and Cumming, Georgia F., Vermont Department of Corrections A Model of Static and Dynamic Sex Offender Risk Assessment (2011)*

*https://www.ncjrs.gov/pdffiles1/nij/grants/236217.pdf* (Last visited December 1, 2018)

102. "Compared with the full population of felony offenders, sex offenders have the lowest recidivism rates for felony offenses (13 percent) and violent felony offenses (6.7 percent) but the highest recidivism rates for felony sex offenses (2.7 percent)"-*Washington State Institute for Public Policy Sex Offender Sentencing in Washington State: Recidivism Rates (2005)*

*http://www.wsipp.wa.gov/ReportFile/908/Wsipp_Recidivism-Rates_Recidivism-Rates.pdf* (Last visited December 1, 2018)